## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## (ATLANTA DIVISION)

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>      **Plaintiff,**<br><br>      **v.**<br><br>REVOLUTIONARY CONCEPTS, INC.,<br><br>SOLOMON RC ALI (a/k/a RICHARD M. CARTER),<br><br>EARNEST H. DELONG, JR.,<br><br>RAINCO INDUSTRIES, INC., and<br><br>NICOLE C. SINGLETARY,<br><br>      **Defendants.** | **Civil Action Number 1:18-cv-_____**<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Plaintiff" or "Commission") alleges as follows:

## SUMMARY OF ACTION

1.    Between 2012 and 2017, Defendant Revolutionary Concepts, Inc.

("REVO"), a company that owns several patents related to smart camera technology, and Defendant Solomon RC Ali ("Ali"), REVO's Senior Vice President of Corporate Finance and Investor Relations, made a series of materially false and misleading statements in press releases and public filings as part of a scheme to defraud investors.  Specifically, under Ali's direction, REVO entered into several sham transactions with purportedly independent companies and then publicized the transactions as being highly lucrative for REVO.  In reality, the transactions were not arm's-length because Ali had close personal and financial connections to the companies.  In addition, Ali had no legitimate basis for telling investors that REVO – which was not earning any revenue at the time – could earn significant revenue as a result of the sham transactions.

2.     Each of the press releases discussed herein contained materially false or misleading statements.  In addition, the press releases collectively conveyed the false impression that REVO had legitimate profit potential as a result of entering into a series of material transactions with independent third parties.  To this day, REVO and Ali have not corrected these press releases.

3.     For example, in December 2012, at Ali's direction, REVO made a public filing with the Commission and issued a press release announcing that REVO was planning to acquire a company that was generating significant revenue.

Ali stated in the press release that the company REVO was going to acquire had earnings of $1 million and that the deal could be worth $15 million.

4.     REVO and Ali failed to disclose that the transaction was not arm's-length because Ali (through a trust he created) was the majority owner of the selling company, and Ali's daughter was an officer and director of that company. The company being acquired also did not have anywhere near $1 million in earnings, and there was no legitimate basis for Ali to value the deal at $15 million.

5.     The daily trading volume for REVO stock increased from 300,000 shares to more than 100 million shares following these false and misleading statements regarding the deal.  This represented a 33,000 percent increase in trading volume for shares of REVO stock.

6.     In January 2014, at Ali's direction, REVO began issuing press releases stating that REVO was negotiating a worldwide licensing agreement for its patents.  Ali is quoted in the press releases as saying that the forecasted annual revenues from the deal is "in the $20 to $30 million range," which was significant because REVO was not generating any revenue at the time.  In February 2014, REVO announced that it had entered into a licensing agreement with an unidentified exclusive, worldwide licensee, and forecasted "$30 million in revenues and $12 million in earnings" from the deal.

7.     REVO and Ali failed to inform investors that, among other ties, REVO owned 40% of the licensee and a trust established by Ali owned 19% of the licensee.  Ali also had no legitimate basis for forecasting $20 to $30 million in revenues or $12 million in earnings from the license agreement.

8.     The daily trading volume for REVO stock increased from around 3.5 million shares before REVO and Ali made these false and misleading statements about the licensing agreement to more than 120 million shares following those statements and other press releases that REVO issued about the deal.  The 120 million shares represented the largest number of REVO shares traded in a single day in the company's history.  REVO even issued another press release with the headline:  "Stock Soars 182%, on News of Global License Deal, Forecasts $30 Million in Sales, and Sets New Trading Record of 120 Million Shares Sold."

9.     In June and July 2014, at Ali's direction, REVO issued press releases and made a public filing with the Commission that reported REVO's agreement "with a funding company" for a $10 million "line of credit" to be extended to REVO's subsidiary.  Ali is quoted as saying the "$10 million revolving credit facility" could generate "an estimated $5 million in annual profits," with "forecasted annual revenues" in the "$10 to $20 million range."

10.     REVO and Ali failed to disclose that the "funding company" was majority-owned by Ali (through a trust he created); that Ali's daughter and girlfriend were officers and directors of the funding company; and that the funding company did not have anywhere close to $10 million to loan to REVO's subsidiary.  In addition, REVO and Ali had no legitimate basis for projecting revenue from the funding agreement in the $10 to $20 million range.

11.     The daily trading volume for REVO stock increased from around 350,000 shares to over 12 million shares as a result of this illusory line of credit.

12.     As described below, REVO and Ali made materially false and misleading statements in, and omitted important information from, additional press releases and public filings to increase investor interest in the company.

13.     REVO, at Ali's direction, also failed to make certain required filings with the Commission.  Ali also failed accurately and timely to report his beneficial ownership of REVO stock, as the federal securities laws required him to do.

14.     By engaging in the conduct alleged in this Complaint, Defendants REVO and Ali violated (or Ali aided and abetted violations of) Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]; and Section 13(a) of the Exchange Act

5

[15 U.S.C. § 77m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. § 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].  Ali also violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3] by failing to report his beneficial ownership of REVO stock.

15.     As described below, Defendants Rainco Industries, Inc. ("Rainco") and its officer and director Nicole C. Singletary ("Singletary") aided and abetted REVO's and Ali's violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  They also violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1] by failing to report their beneficial ownership of REVO stock.

16.     As described below, Defendant Earnest H. DeLong, Jr. ("DeLong"), an Atlanta, Georgia attorney who serves as the trustee of seven trusts created by Ali, violated Sections 16(a) and 13(d) of the Exchange Act and Rules 16a-3 and 13d-1 thereunder by failing to report his beneficial ownership interest in REVO stock.

## JURISDICTION AND VENUE

17.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the

Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties, disgorgement plus prejudgment interest (as to Ali), an officer and director bar, a penny stock bar, and for other equitable relief.

18.     The Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

19.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27(a) of the Exchange Act [15 U.S.C. § 78a(a)].

20.     Defendants, directly and indirectly, made use of the mails, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

21.     Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred within the jurisdiction of the United States District Court for the Northern District of Georgia, including but not limited to the fraudulent press releases being published to investors within this judicial district who bought and sold REVO stock during the relevant time period.  In addition, Defendant DeLong resides and works in this

judicial district, Defendant Rainco is incorporated in Georgia and has a principal office address in this judicial district, and Defendant Ali created several trusts that are domiciled in Georgia that were involved in the scheme to defraud alleged herein.

22.    Defendants, unless enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged herein, and in transactions, acts, practices, and courses of business of similar purport and object.

## **DEFENDANTS**

23.    **Revolutionary Concepts, Inc.** is a U.S. public company that was founded in 2004 and is currently incorporated in Nevada.  REVO owns and licenses certain patents that relate to smart camera technology.  REVO's common stock is registered under Section 12(g) of the Exchange Act, is traded under the symbol "REVO," and is a "penny stock" under Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder.  REVO also issued shares of unregistered preferred stock.

24.    **Solomon RC Ali (a/k/a Richard M. Carter)**, age 53, resides near Charlotte, North Carolina.  On December 2, 2008, Ali changed his name from Richard Marshall Carter, Jr. to Solomon RC Ali.  Ali is not related to Ronald E. Carter ("Carter"), the founder and former CEO of REVO.

25.     In 2010, REVO hired Ali as a director and as Senior Vice President of Corporate Finance and Investor Relations.  Ali was the senior executive at REVO who handled the company's finance and investor relations activities.  Among other duties, Ali oversaw the drafting, review, approval, and publication of REVO's press releases.  Ali also signed REVO's annual reports on Form 10-K that were publicly filed with the Commission, and he reviewed the company's quarterly reports on Form 10-Q and current reports on Form 8-K that were publicly filed with the Commission.  In 2016, Ali replaced Carter as the CEO of REVO.

26.     In addition to his duties at REVO, Ali has served since 2009 as an executive officer and director of Universal Bioenergy, Inc. ("UBRG"), a public company based in California that purports to be an energy development business.

27.     Ali also created seven irrevocable trusts (collectively the "Ali Trusts") that are domiciled in Georgia.  Ali designated himself and his relatives as the primary beneficiaries of the Ali Trusts, and Ali appointed his attorney, DeLong, as the trustee.  The Ali Trusts consist of:  (1) Deen Executive Trust; (2) Falah Family Trust; (3) Ghanimah Holdings Trust; (4) Ibadah Life Trust; (5) Patronus Capital Trust; (6) Premier Executive Trust; and (7) Rainco Holdings Trust.

28.     **Earnest H. (Woody) DeLong, Jr.**, age 73, resides in Atlanta,

Georgia.  He is an attorney who has served as the sole trustee of the Ali Trusts

since their inceptions.  He has also served as Ali's attorney.

29.     **Rainco Industries, Inc.** is a private equity firm incorporated in

Georgia on December 7, 2011.  Its predecessor, Rainco Industries, Inc., was

incorporated in Delaware in 2006, and also operated as an unincorporated business

using the same name.  For purposes of this Complaint, Rainco means Rainco

Industries, Inc., whether operating as a Georgia or Delaware corporation, or as an

unincorporated business.

30.     Ali founded Rainco.  From at least 2011, an Ali Trust for which Ali is

the beneficiary has owned 55% of Rainco and Ali's mother has owned 11% of the

company.

31.     In addition, Ali's daughter and girlfriend (Singletary) have been

Rainco executive officers and directors from at least 2011 through all or

substantially all of the period of misconduct, and they have exercised policy

functions for the company.

32.     From at least 2011, Ali's signature appears on various Rainco

documents as an executive officer or director of the company using his former

name Richard Carter; Ali had access to and received payments from at least one bank account in the name of Rainco; and Ali was a creditor of Rainco.

33.     **Nicole C. Singletary**, age 53, resides near Charlotte, North Carolina. During the period of misconduct, she served as a director and executive officer of Rainco, and she served as an executive officer of REVO's wholly-owned subsidiary.  Singletary also was Ali's girlfriend during this time period.

## STATEMENT OF FACTS

**I.     DEFENDANTS TOUT SHAM TRANSACTIONS AS LUCRATIVE ARM'S-LENGTH DEALS WITH INDEPENDENT THIRD PARTIES**

### A.     REVO's Acquisition of Greenwood Finance Group, LLC

34.     On December 4, 2012, REVO filed a Form 8-K in which it announced that "over the past three months, we have been in discussion and actively seeking to acquire a company that is generating significant revenues and net profits."

35.     On December 6, 2012, REVO issued a press release announcing that the company was seeking a "$15 [m]illion [a]cquisition."  Ali is quoted as saying: "As we pursue this relationship, Management believes the acquisition could be valued at greater than $15 million.  The company being evaluated has a current EBITDA in excess of $1 million.  We are confident this transaction will bring significant value to Revolutionary Concepts and, more importantly, to our shareholders who have been supportive of our efforts over the years."

36.     The "company being evaluated" by REVO was Greenwood Finance Group, LLC ("Greenwood").  Greenwood was a newly-formed entity that had no revenues or apparent business activities.  Greenwood was owned by Rainco, which was majority-owned by an Ali Trust for Ali's benefit.

37.     In December 2012, Greenwood's assets consisted solely of seven promissory notes that were issued by the Ali Trusts.  Rainco's directors authorized Greenwood's acquisition of the notes pursuant to written resolutions, which reflect signatures of Ali (signing as Richard Carter), Singletary, and Ali's daughter.  The Ali Trust notes were in the total principal amount of approximately $7.1 million. The notes matured in ten years, and required the Ali Trusts collectively to pay Greenwood interest of approximately $1 million per year.

38.     The Ali Trusts did not have the funds to make the annual $1 million interest payment.  The Ali Trusts also lacked the funds to pay the $7.1 million in principal due on the seven notes.

39.     REVO's and Ali's statements in the December 4, 2012 Form 8-K and the December 6, 2012 press release were false and misleading.  Among other things, the Form 8-K and press release falsely and misleadingly stated that Greenwood (the company REVO was acquiring) was generating significant revenues and net profits; that the deal could be valued at more than $15 million;

and that Greenwood currently had EBITDA in excess of $1 million.  The Form 8-K and press release also omitted the fact that Ali had significant personal and financial connections to Rainco and Greenwood; that Ali and his family members would benefit financially from the transaction; and that the assets of Greenwood consisted solely of the Ali Trust notes that Greenwood acquired from Rainco.

40.     REVO's statements also conveyed the false impression that it was acquiring an independent company through an arm's-length transaction.

41.     The daily trading volume for REVO stock increased from 300,000 shares on December 3, 2012, to more than 100 million shares on December 4, 2012.  This represents a 33,000 percent increase in trading volume for REVO stock.  The trading volume for REVO stock remained above 60 million shares following the December 6, 2012 press release.

42.     On December 7, 2012, REVO entered into a written agreement to purchase Greenwood from Rainco for $18 million in REVO securities.  As a result, Greenwood became REVO's wholly-owned subsidiary.  Ali was the senior executive at REVO who recommended that REVO acquire Greenwood, and he was the person who negotiated the deal on behalf of REVO.

43.     Singletary, then Ali's girlfriend, was the senior executive who signed the agreement on behalf of Rainco.  After REVO acquired Greenwood, Singletary

also served as Greenwood's senior officer.

44.     In exchange for Greenwood, REVO issued 10 million shares of its Series A Convertible Preferred Stock to Rainco.  REVO was required to pay Rainco a $1.8 million annual dividend on the preferred stock and each share of the preferred stock was convertible into 1.8 shares of REVO common stock.

45.     On December 20, 2012, REVO filed a Form 8-K announcing the Greenwood acquisition.  REVO reported that Greenwood expects "unaudited EDBITA [sic] in excess of $3.5 million for 2012 and unaudited assets in excess of $7.0 million and total liabilities of less than $3.0 million."

46.     These statements, and others, in REVO's Form 8-K were false and misleading.  Among other things, REVO failed to disclose Ali's relationships to Rainco and the Ali Trusts, including his financial interests in them, and there was no legitimate basis for REVO to state that Greenwood had $7 million in assets.

47.     REVO also filed annual reports on Form 10-K on April 15, 2013 and May 1, 2014, and other periodic filings, that contained substantially similar false and misleading statements about the Greenwood acquisition.

48.     As Greenwood's senior officer, Singletary had the opportunity to review in advance at least the REVO annual report filed in 2014, but she did not correct the misstatements contained in it even though she had the chance to do so.

49.     REVO also issued false and misleading press releases touting its

Greenwood acquisition.  For example, on January 4, 2013, REVO issued a press

release announcing "its recent acquisition of Greenwood Finance Group, LLC,"

stating that the deal "is a major move" in REVO's plan to bring its technology into

development and production stages.  The press release repeated the false and

misleading statements that:  "While both sides are still in the audit process,

Greenwood Finance Group represents an EBITDA in excess of $3.5 million for

2012 and assets of $7 million with total liabilities of less than $3 million."

50.     Ali is quoted in the January 4, 2013 press release as stating:  "After

several months of negotiations, we are enthusiastic about an acquisition that brings

[REVO] significant revenues, assets, and the potential for greater upside in 2013.

This is an historical event in terms of [REVO] finally becoming profitable.  We

will continue to focus on driving shareholder value through strategic deal

structures that will enhance the overall value of our company.  Greenwood is the

first acquisition providing much needed book value and cash flow."

51.     REVO's and Ali's statements in the January 4, 2013 press release

were false and misleading.  Greenwood did not have "significant revenues,"

"assets," or "cash flow" at that time.  In addition, Ali failed to disclose his

relationships to Rainco and the Ali Trusts and his financial interest in the deal,

15

thereby creating the false impression that REVO was acquiring an independent company through an arm's length transaction.

52.     The daily trading volume for REVO stock increased from 4 million shares on January 3, 2013, to more than 12 million shares on January 4, 2013.  By January 7, 2013 (the next trading day), the trading volume for REVO stock increased to more than 91 million shares.

53.     On January 7, 2013, Rainco issued its own press release touting the Greenwood deal as being "valued at $18 million" to REVO.  Singletary is quoted as saying, falsely, that Greenwood generated "over $7 million in revenue and $3.5 million in profit" for REVO with "$15-$18 million in asset book value."  In truth, Greenwood generated no such revenue or profit for REVO in 2012.

54.     REVO issued another press release touting the Greenwood acquisition on January 9, 2013.  In this press release, Ali falsely stated:  "On the heels of $3 million in profits from 2012 to work with, Greenwood is set to exceed its 2012 funding revenue.  The successful implementation of the new strategies will be an enormous benefit to [REVO] as we move forward in the manufacturing and licensing of our software patents and continue to explore acquisitions.  [REVO] will now have access to a larger spectrum of lending and financing sources."

55.     Contrary to Ali's statements, Greenwood did not have $3 million in

profits in 2012 and did not provide REVO access to additional financing because Greenwood did not have the necessary funds.

**B.    The Eyetalk365, LLC License Agreement**

56.    In late 2013, Ali, Singletary, and others decided to license REVO's patents to Eyetalk365, LLC ("Eyetalk"), a company that was recently formed for the purpose of licensing the patents and protecting them from infringement.

57.    Eyetalk was going to be owned:  40% by REVO; 19% by Ali; 3.8% by Rainco; 3% by Rainco Management, LLC, an entity operated by Singletary and majority-owned by other Ali Trusts; 15.2% by REVO founder Carter; and 19% by an Eyetalk manager.  Ultimately, based on Ali's recommendation, Ali's 19% interest in Eyetalk was held by an Ali Trust for the benefit of Ali's daughter, and Carter's 15.2% interest in Eyetalk was held by a trust created by Carter for the benefit of himself and his family (the "Carter Trust").

58.    The Ali Trust received its interest in Eyetalk through a series of circular transactions initiated by Ali.  First, Ali gifted to the Ali Trust $500,000 of REVO notes owed to him by REVO for unpaid compensation.  Then, the Ali Trust transferred the $500,000 of REVO notes to Eyetalk.  Finally, Eyetalk gave the Ali Trust a 19% ownership interest in the company.  The Carter Trust acquired its interest in Eyetalk through a similar arrangement that involved $400,000 in REVO

notes that were owed to Carter by REVO for unpaid compensation.  Based on these transactions, Eyetalk held $900,000 of REVO notes ($500,000 from Ali and $400,000 from Carter).

59.     In January 2014, REVO began issuing press releases indicating that it was negotiating a worldwide licensing agreement for its patents.

60.     On January 6, 2014, REVO stated in a press release that its "discussions and negotiations have reach[ed] an advanced stage whereby the Company believes it will be entering into a licensing agreement for one or more of its patents, and will close the transaction very soon."  REVO further stated:  "After extensive discussions and negotiations, REVO decided it was in its best interests to license its technologies now, to generate long-term revenues for the Company through residual and ongoing licensing fees and royalties."

61.     REVO's January 6, 2014 press release did not disclose that the company it was negotiating with (Eyetalk) was affiliated with REVO, such that the contemplated agreement was not an arm's length transaction; REVO was going to have a 40% ownership interest in Eyetalk; an Ali Trust was going to have a 19% ownership interest in the company; and other entities with close relationships to Ali and Singletary would also have ownership interests in the company.

62.     The daily trading volume for REVO's stock increased over the next

day from 3 million shares to 37 million shares.

63.    On January 21, 2014, REVO issued a press release that indicated the company was "in advanced contract negotiations with a technology company that plans to acquire an exclusive worldwide licensing agreement from REVO to commercialize REVO's online patented wireless mobile security alarm services system.  REVO projects that the transaction could generate substantial long-term revenues for the Company through residual and ongoing licensing fees and royalties."

64.    Ali stated in the January 21, 2014 press release that:  "We have a great deal of confidence in the direction and negotiations for our initial licensing of the patents.  The prospective licensor wants to acquire an exclusive worldwide license and is moving forward expeditiously to complete the due diligence process.  We believe the closing of the transaction will take place very soon."

65.    REVO's January 21, 2014 press release failed to disclose that REVO would have a 40% ownership interest in Eyetalk; an Ali Trust was going to have a 19% ownership interest in the company; and other entities with close relationships to Ali and Singletary would also have ownership interests in the company.

66.    By failing to disclose the relationship between REVO, Ali, and Eyetalk, the press releases created the false and misleading impression that an

independent third party was interested in obtaining a license from REVO.

67.    The daily trading volume for REVO stock increased from around two million shares on the prior trading day to more than 60 million shares on January 21, 2014.

68.    On February 6, 2014, REVO issued another press release touting the licensing of its patents.  In the press release, Ali stated that:  "In view of the advance contract negotiations to license our patented wireless mobile alarm services system to another company, we believe considering a stock repurchase right now, with the current stock price in the market, provides us with an opportunity to invest in our Company and increase shareholder value."

69.    Ali failed to disclose in the February 6, 2014 press release that the "contract negotiations" were with a newly-formed company in which an Ali Trust was going to have a 19% ownership interest; that REVO would have a 40% ownership interest in the company; and that other entities with close relationships to Ali and Singletary would also have ownership interests in the company.

70.    The daily trading volume for shares of REVO stock increased from around 2.5 million shares on February 5, 2014, to more than 27 million shares on February 6, 2014.  The next day the trading volume for REVO stock increased to more than 60 million shares.

71.     Effective February 10, 2014, under Ali's direction, REVO and Eyetalk signed a license agreement granting Eyetalk an "exclusive worldwide" license to most of REVO's patents.  The license agreement stated that REVO would receive a 40% interest in Eyetalk, and Eyetalk would pay REVO a $900,000 fee "in cash or equivalent agreed upon consideration."  Eyetalk paid the fee by transferring to REVO the $900,000 of REVO notes obtained from the Ali and Carter Trusts.  REVO then cancelled the notes and touted its receipt of net income.

72.     On February 12, 2014, REVO filed a Form 8-K and issued two press releases touting the license agreement with Eyetalk, but failing to identify Eyetalk by name.  The Form 8-K and press releases also contained false and misleading information about the transaction.

73.     In the Form 8-K, REVO stated that it "has signed an Agreement with a company that acquired an exclusive global license from REVO to commercialize REVO's patented wireless security alarm services system.  The Licensee is a company that buys and markets security systems and other technologies, and has signed a multi-year worldwide agreement for them to commercialize REVO's patented 'EyeTalk Communicator System.'"

74.     The Form 8-K went on to state:  "The terms of the Agreement include among other things; an exclusive worldwide license of REVO's patented

21

technologies . . . .  REVO will also receive an up-front sign-up fee or pre-commercialization fee of $900,000 in consideration."

75.    In the first press release on February 12, 2014, REVO announced that it had "signed an agreement with a company that acquired an exclusive global license" and that REVO "projects the transaction could generate millions in long-term revenues for the Company through residual and ongoing licensing fees and royalties."  The press release also stated that "REVO will receive an up-front sign-up fee or pre-commercialization fee of $900,000 in consideration and ongoing royalties and licensing fees throughout the duration of the agreement."

76.    Ali is quoted in the press release as stating:  "We are very excited about forging this new relationship to license our patented technology security system.  This represents a major milestone and an unparalleled precedent in the history of our company, as well as a tribute to the hard work and ingenuity of our team.  The Licensee and their investors formed a new subsidiary company just to acquire, commercialize, exploit and market the patented system, and to sell sublicenses.  The agreement with the Licensee does not allow us to disclose their name at this time, but it should at a later date."

77.    The Form 8-K and first press release issued on February 12, 2014 failed to disclose that REVO had a 40% ownership interest in Eyetalk; an Ali Trust

had a 19% ownership interest in the company; and entities with close relationships to Ali and Singletary also had other ownership interests in the company.  By failing to include this information, the Form 8-K and press release misleadingly suggested that an independent third party had acquired a license from REVO and negotiated that license agreement through an arm's length transaction.  The Form 8-K and press release were also misleading because the $900,000 fee was actually just transfers of Ali's and Carter's REVO notes, which REVO canceled and then recorded as income.

78.     The second press release that REVO issued on February 12, 2014 also contained material misstatements.  Specifically, the headline of the press release stated:  REVO "Forecasts $30 million in Revenues and $12 million in Earnings from [the] Global License of its Patented Technology Security System."  The press release also repeated the misleading statement that the "Licensee will pay REVO an up-front or pre-commercialization fee of $900,000 in consideration[.]"

79.     Ali is quoted in the press release as stating:  "We feel very positive about the new partnership with our Licensee and the potential revenues.  The total forecasted annual revenues to be generated is in the $20 to $30 million range.  The potential earnings for REVO is [sic] estimated at $8 to $12 million annually.  Although we cannot guarantee an actual valuation, according to industry valuation

standards using average P/E ratios from Standard & Poor's, at a multiple of 15 times earnings, a valuation of $120 to $180 million dollars is an estimate of the potential additional market value of the earnings to REVO."

80.     Ali had no legitimate basis for making these earnings and revenue projections.  At the time, REVO was not earning any revenue from its patents.  In addition, Ali failed to disclose to investors the Ali Trust's ownership interest in Eyetalk.

81.     On February 12, 2014, the daily trading volume for REVO stock increased to more than 120 million shares, which made it the largest trading day ever for REVO.

82.     On February 13, 2014, REVO issued a press release with the headline: "Stock Soars 182%, on News of Global License Deal, Forecasts $30 million in Sales, and Sets New Trading Record of 120 million Shares Sold."

83.     The February 13, 2014 press release noted:  "Investors quickly snapped up the stock at an average rate of over 18.55 million shares per hour during the trading day and rapidly bid up REVO's shares to $0.0141 at the close of the trading day for a gain of 182.00% over Tuesday's closing price of $0.005.  A total of 120,588,619 shares were traded on Wednesday, which was 7.85 times the average daily trading volume of 15,367,195 of REVO's shares.  The 120,588,619

shares traded broke all previous trading barriers and set a new record high in

trading volume for a single day in REVO's history."

84.    Ali is quoted in the February 13, 2014 press release as saying:  "This

was truly a monumental day for our Company and especially for our loyal

shareholders. That was the largest trading day ever for our Company in terms of

price gain, volume and liquidity.  With the announcement of the global license

agreement, projected sales and earnings, the market responded very favorably to

investing in the future of REVO."

### C.    REVO's $10 Million Funding Agreement

85.    On June 24, 2014, REVO issued a press release stating that its

subsidiary Greenwood had "signed a Letter of Intent and is working on a

Definitive Agreement that would provide a Ten Million dollar line of credit to fund

its revitalized investment operations."

86.    Ali stated in the press release:  "Greenwood's new funding agreement

not only provides an opportunity for Greenwood to offer positive investment

options with its clients, it also positions Greenwood for a joint venture opportunity

with a firm seeking a private equity partnership with a strong data base."

87.    Ali went on to state:  "This news comes on top of recent meetings

held between Greenwood and its original investors who owe the company seven

million dollars in receivables.  During those meetings, officers of Greenwood

expressed the urgency of each of the investors to begin making interest payments

on its obligations to the company."

88.     REVO's and Ali's statements in the June 24, 2014 press release were

misleading.  REVO and Ali failed to inform investors that:  (i) the funding

agreement was going to be with Rainco, which could not provide $10 million in

funding to REVO's subsidiary (or anywhere close to that amount); (ii) Rainco had

extensive connections to Ali – in fact, Ali was the majority owner of Rainco

(through an Ali Trust); (iii) Rainco had extensive connections to Singletary, who

functioned as a Rainco executive officer and director, and who simultaneously was

functioning as Greenwood's executive officer; and (iv) the "original investors"

who owed Greenwood $7 million (but had failed to make payments) were the Ali

Trusts (the primary beneficiaries of which were Ali and his family).

89.     By failing to include this information, the June 24, 2014 press release

misled investors that a third party had independently determined that REVO and its

subsidiary were sufficiently viable so as to justify a $10 million line of credit and

had the ability to provide such funds.

90.     The daily trading volume for REVO stock increased from 361,000

shares on June 23, 2014, to more than 12 million shares on June 24, 2014.

91.     On June 26, 2014, based on Ali's recommendation, REVO, Greenwood, and Rainco signed multiple documents under which Rainco agreed to loan Greenwood up to $10 million, even though Rainco did not have anywhere near $10 million available to lend to Greenwood.  REVO (through Ali) and Greenwood (through Singletary) nevertheless signed a $10 million note in favor of Rainco, at a time when Singletary also performed director and other executive functions for Rainco.

92.     On July 2, 2014, REVO issued a Form 8-K and a press release reporting its agreement "with a funding company" for a $10 million "line of credit."  The press release quoted Ali as stating that securing the "$10 million revolving credit facility" is a "monumental step in the history of REVO and Greenwood," and that the credit facility could generate "an estimated $5 million in annual profits," with "forecasted annual revenues to be generated" in the "$10 to $20 million range."

93.     REVO's and Ali's statements in the Form 8-K and press release issued on July 2, 2014 omitted Rainco's identity as the funder, failed to disclose Ali's and Singletary's relationship to Rainco, and did not inform investors that Rainco did not have $10 million to loan to REVO's subsidiary.  In addition, Ali had no legitimate basis for making revenue projections of $10-$20 million.

94.     The daily trading volume of REVO's stock increased from around 1.5 million shares on July 1, 2014, to more than 6 million shares on July 2, 2014.

### D.     Convertible Note Transactions

95.     From 2012 through at least 2014, under Ali's direction, REVO offered and sold at least 25 notes to Rainco that were convertible into REVO stock.  The REVO notes had a total principal amount of at least $574,000, and were supposed to pay annual interest of 10% to 12%.

96.     From 2012 through at least 2014, under Ali's direction, UBRG (the other public company for which Ali also served as an officer and director), offered and sold at least 16 notes to Rainco that were convertible into UBRG stock.  The UBRG notes had a total principal amount of at least $513,000, and were supposed to pay annual interest of 10% to 12%.

97.     Under Ali's direction, Rainco became the largest lender to REVO and UBRG to fund their ongoing operations, and a significant holder of their convertible notes.  Rainco obtained cash primarily by converting REVO and UBRG notes to their stock, and either selling the stock into the public market, or selling or otherwise transferring the notes in private transactions.  Certain Ali Trusts also acquired convertible REVO notes and convertible UBRG notes, often through transfers of such notes from Rainco.

98.     From 2012 through 2014, REVO and UBRG filed annual and quarterly reports that listed their note issuances and any conversions of such notes into stock.

99.     In these annual and quarterly reports, REVO and UBRG falsely described the note transactions and/or note conversions with Rainco and the Ali Trusts as being with a "non-related creditor" or an "unrelated third party."

100.    Rainco was a related party because, at a minimum, Ali's daughter was a Rainco executive officer and director.

101.    Ali also had other undisclosed relationships to Rainco, including that: Ali – as the beneficiary of an Ali Trust – had a majority-ownership interest in Rainco; Ali appears to have functioned as a Rainco executive officer by signing certain documents on behalf of Rainco; Ali was receiving payments from Rainco through at least one Rainco bank account; and Ali was a creditor of Rainco.

102.    Ali signed REVO's and UBRG's annual reports that contained the misstatements.  In addition Ali had an opportunity to review the companies' quarterly reports that contained the false information before they were filed.

103.    Singletary, who at a minimum knew Ali's daughter was a Rainco officer and director, also had the opportunity to review in advance of filing at least REVO's annual report filed in May 2014 and the quarterly report filed in May

2014.  She failed to correct the misstatements contained in them even though she had the opportunity to do so.

104.   In 2012 and 2013, under Ali's direction, REVO also fraudulently offered and sold three notes to a private investor in the total amount of $112,500.

105.   REVO and the private investor entered into written agreements dated October 12, 2012, January 17, 2013, and June 4, 2013, for REVO notes convertible into stock.  REVO falsely stated in the agreements with the private investor that the reports REVO had filed with the Commission "complied in all material respects" with the Exchange Act and related rules at the time of filing, and that none of the documents contained untrue statements of material fact.

106.   These statements to the private investor were false and misleading because, among other things, REVO's public filings with the Commission falsely and misleadingly reported the note transactions and conversions involving Rainco and the Ali Trusts as being with a "non-related creditor" or an "unrelated third party."

### E.   Greenwood's Receipt of UBRG Notes As Interest

107.   On January 16, 2015, REVO issued a press release stating:  "Income from a series of transactions recorded this month have a cash value that may well exceed one million dollars."

108.   The daily trading volume for REVO stock increased from approximately 350,000 shares on January 15, 2015, to more than 2.5 million shares on January 16, 2015, and more than 9 million shares the following trading day.

109.   On February 13, 2015, REVO filed a quarterly report stating that, on January 2, 2015, Greenwood "began collecting interest payments on its $7,000,000.00 in notes receivable" that consisted of "cash equivalents valued at approximately $1.2 million."

110.   The daily trading volume for shares of REVO stock increased from around 700,000 shares on February 12, 2015, to more than 1.5 million shares on February 13, 2015, and around 3 million shares the following trading day.

111.   REVO's January 16, 2015 press release and February 13, 2015 quarterly report contained false and misleading information.  REVO failed to disclose that, under Ali's direction, Greenwood had accepted UBRG notes from certain Ali Trusts as partial payments on delinquent interest due to Greenwood under the Ali Trusts' notes issued in 2012.  REVO and Ali failed to disclose that the "income" and "cash equivalents" were actually the UBRG notes in the total principal amount of $175,761, which Greenwood had received from certain Ali Trusts.  The Ali Trusts had in turn received the UBRG notes from Rainco in January 2015.  REVO also failed to disclose Ali's relationships to UBRG, the Ali

31

Trusts, and Rainco, and that there was no legitimate basis for the $1.2 million dollar valuation because the principal amount of the UBRG notes was only $175,761.  In addition, REVO and Ali failed to disclose that, in any event, UBRG did not appear to have the funds to pay the obligations due under the UBRG notes.

### F.    Change in Control of REVO and Transfer of Eyetalk Interest

112.   Effective March 31, 2016, REVO issued different series of new preferred stock paying 10.5% dividends to Ali, six Ali Trusts (through DeLong as trustee), Rainco, and Carter.  REVO executed certificates, also effective March 31, 2016, indicating, among other things, that the preferred stock was convertible into REVO common stock, and that holders of the preferred stock had certain increased rights to vote on matters presented to REVO's common stockholders.

113.   Through DeLong, three of the Ali Trusts acquired new REVO preferred stock that gave them the collective right to vote a majority of REVO's common stock.  As a result, REVO's issuance of the new preferred stock effected a change in control of REVO.

114.   In addition, effective March 31, 2016, REVO assigned its 40% interest in Eyetalk to R. I. Holdings, Inc., in exchange for preferred stock paying a 10.5% dividend.  R. I. Holdings had been newly-organized in March 2016 by DeLong, the trustee of the Ali Trusts.  Singletary is the sole officer and common

stockholder of R. I. Holdings.  Singletary and DeLong are the directors of R. I. Holdings.

115.   REVO did not publicly disclose the effective change in control of REVO or the transfer of REVO's 40% interest in Eyetalk until February 2017, almost one year after the events occurred.

116.   On December 12, 2016, through DeLong, the three Ali Trusts that collectively acquired voting majority shareholder control of REVO acted to remove Carter as a REVO director.

117.   The remaining directors removed Carter as an officer and appointed Ali as REVO's new CEO.

118.   On January 10, 2017, REVO filed a Form 8-K, signed by Ali, stating: "On December 12, 2016, the majority shareholders of the Company chose to remove Ron Carter as a member of the Board of Directors.  There were no disagreements between Ron Carter and the Company."

119.   REVO and Ali failed to disclose that the "majority shareholders" were three Ali Trusts that obtained their voting rights through undisclosed preferred stock transactions, that Ali has close relationships to the Ali Trusts, and that there were disagreements between Carter and REVO regarding, among other things, Carter's ouster from the company.

120.   On February 24, 2017, REVO filed a Form 8-K, signed by Ali, that finally disclosed information about the effective change in shareholder voting control and the transfer of REVO's interest in Eyetalk.  Among other things, REVO stated that it "purchased Preferred Shares of a newly created entity formed by a group of investors," but failed to disclose the relationships of those investors to Ali.

## II.   DEFENDANTS FAIL TO COMPLY WITH BENEFICIAL OWNERSHIP AND OTHER REPORTING REQUIREMENTS

### A.   **Solomon RC Ali**

121.   From at least 2010, Ali has served as an executive officer and director of REVO, and he has acquired and owned REVO Stock.

122.   In September 2014, Rainco assigned 18,746,435 shares of REVO stock to Richard M Carter, LLC.

123.   Ali acted as the controlling member of Richard M Carter, LLC, and he had or shared investment control over its securities portfolio.

124.   Ali failed to report his beneficial ownership of REVO stock with the Commission.  Ali was required to do so because of his status as an executive officer and director of REVO.

125.   In the press releases and public filings described above, Ali also failed to disclose his beneficial ownership of REVO stock to investors.

**B.**   **Nicole Singletary and Rainco Industries, Inc.**

126.   On November 23, 2013, REVO issued 10,000,000 shares of preferred stock to Rainco that was immediately convertible into shares of REVO stock. REVO issued the convertible preferred stock to Rainco as a result of REVO's purchase of Greenwood from Rainco.

127.   Under Rule 13d-3(d)(1) of the Exchange Act, Rainco was deemed to be the beneficial owner of the common stock that Rainco could have received upon conversion which, with Rainco's other common stock, then represented approximately 5.15% of REVO's issued and outstanding common stock.

128.   On November 25, 2013, Rainco acquired 25,000,000 additional shares of REVO common stock.  Rainco became the beneficial owner of approximately 9.36% of REVO's then issued and outstanding common stock.

129.   Effective March 31, 2016, Rainco acquired new, immediately convertible REVO preferred stock.  Under Rule 13d-3(d)(1) of the Exchange Act, Rainco was deemed to be the beneficial owner of the common stock that the preferred stock could have been converted into, which represented approximately 5.8% of REVO's then issued and outstanding common stock.

130.   In 2013, Singletary was a Rainco officer and director, and she had or shared the power to direct the acquisition, voting, and disposition of the REVO common stock held by Rainco.

131.   In 2016, Singletary also signed documents on behalf of Rainco for the acquisition of new REVO preferred stock.

132.   Neither Rainco nor Singletary filed the appropriate forms with the Commission to report Rainco's beneficial ownership of REVO common stock.

### C.   **Earnest DeLong**

133.   DeLong, as trustee of the Ali Trusts, has or shares the power to acquire, vote, and dispose of the REVO common stock and REVO preferred stock owned by the Ali Trusts.

134.   DeLong was and remains a beneficial owner of the REVO common stock held by the Ali Trusts.

135.   From at least 2012, the Ali Trusts executed transactions in REVO common stock and they were deemed to have acquired more than 5%, and sometimes more than 10%, of REVO's then issued and outstanding common stock.

136.   In particular, effective October 1, 2012, REVO issued 12,599,488 shares of REVO common stock to three Ali Trusts, representing approximately 5.26% of REVO's then issued and outstanding common stock.  As a result, the

seven Ali Trusts together acquired and owned over 19% of REVO's then issued and outstanding common stock.

137.   In addition, in August and September 2013, two Ali Trusts purchased shares of REVO common stock in the public market, and the seven Ali Trusts' total REVO common stock rose from approximately 8.7% to over 12% of REVO's then issued and outstanding common stock.

138.   Effective March 31, 2016, six Ali Trusts also acquired REVO preferred stock that was immediately convertible into over 10% of REVO's then issued and outstanding common stock.  DeLong is deemed, pursuant to Section 13(d) of the Exchange Act and Rule 13d-3(d)(1) thereunder, to be the beneficial owner of the REVO common stock into which the preferred stock could have been converted.

139.   DeLong did not report his beneficial ownership of his more than 5%, or more than 10%, of REVO common stock to the Commission.  He was required to do so by Sections 13(d) and 16(a) of the Exchange Act and Rules 13d-1 and 16a-3 thereunder.

**D.   <u>REVO and UBRG</u>**

140.   REVO filed its last quarterly report on February 13, 2015, its last annual report on May 1, 2014, and its last current report on February 24, 2017.

141.   REVO is delinquent in filing required periodic and other reports with the Commission, and otherwise failed to comply with applicable reporting requirements of the Commission.

142.   UBRG filed its last quarterly report on May 28, 2014, its last annual report on October 15, 2013, and its last current report on May 20, 2015.

143.   UBRG is delinquent in filing required periodic and other reports with the Commission, and otherwise failed to comply with applicable reporting requirements of the Commission.

## COUNT I – FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]
### (Against REVO and Ali)

144.   Paragraphs 1 through 143 are realleged and incorporated herein by reference.

145.   Defendants REVO and Ali, acting with scienter, in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, employed a device, scheme, or artifice to defraud.

146.   By reason of the foregoing, REVO and Ali, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II – FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and (3)]
### (Against REVO and Ali)

147.   Paragraphs 1 through 143 are realleged and incorporated herein by reference.

148.   Defendants REVO and Ali, acting knowingly, recklessly, or negligently in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, (a) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices, or a course of business which operated or would have operated as a fraud or deceit upon the purchaser.

149.   By reason of the foregoing, REVO and Ali, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

**Violations of Section 10(b) of the Exchange Act
and Rules 10b-5(a), (b), and (c) thereunder
[15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5(a), (b), and (c)]
(Against REVO and Ali)**

150.   Paragraphs 1 through 143 are realleged and incorporated by reference herein.

151.   Defendants REVO and Ali, acting with scienter and in connection with the purchase or sale of securities and by the use of any means or instrumentality of interstate commerce or by use of the mails or any facility of any national securities exchange, directly or indirectly, (a) employed a device, scheme, and artifice to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or a course of business which operated or would have operated as a fraud or deceit upon sellers, purchasers, or prospective purchasers of securities.

152.   By engaging in the conduct described above, REVO and Ali violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5].

## COUNT IV – CONTROL PERSON LIABILITY (FRAUD)

### Violations of Section 20(a) of the Exchange Act
### [15 U.S.C. § 78t(a)]
### (Against Ali)

153.   Paragraphs 1 through 143 are realleged and incorporated by reference herein.

154.   At all times relevant hereto, Defendant Ali controlled REVO and UBRG for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

155.   By engaging in the conduct alleged above, Defendant Ali is liable as a control person for REVO's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

156.   By engaging in the conduct alleged above, Defendant Ali is also liable as a control person for UBRG's uncharged violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], which resulted from UBRG's falsely and misleadingly identifying Rainco and the Ali Trusts as non-related note holders in reports filed with the Commission.

## COUNT V – AIDING AND ABETTING (FRAUD)

**Aiding and Abetting Violations of Section 17(a) of the Securities Act
[15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder
[17 C.F.R. § 240.10b-5(a), (b), and (c)]
(Against Ali)**

157.    Paragraphs 1 through 143 are realleged and incorporated by reference herein.

158.    As alleged above, REVO violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

159.    Defendant Ali knew, or recklessly disregarded, that REVO's conduct was improper and knowingly rendered to REVO substantial assistance in this conduct.

160.    As alleged above, UBRG violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

161.    Defendant Ali knew, or recklessly disregarded, that UBRG's conduct was improper and knowingly rendered to UBRG substantial assistance in this conduct.

162.    By reason of the foregoing, Defendant Ali aided and abetted violations of and, unless enjoined, will continue to aid and abet violations of Section 17(a) of

42

the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-

5(a), (b), and (c)].

## <u>COUNT VI – AIDING AND ABETTING (FRAUD)</u>

**Aiding and Abetting Violations of Section 17(a) of the Securities Act
[15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder
[17 C.F.R. § 240.10b-5(a), (b), and (c)]
<u>(Against Rainco and Singletary)</u>**

163.   Paragraphs 1 through 143 are realleged and incorporated by reference

herein.

164.   As alleged above, REVO and Ali violated Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-

5(a), (b), and (c)].

165.   Defendants Rainco and Singletary knew, or recklessly disregarded, that

REVO's and Ali's conduct was improper and knowingly rendered to REVO and Ali

substantial assistance in this conduct.

166.   By reason of the foregoing, Defendants Rainco and Singletary aided and

abetted violations of and, unless enjoined, will continue to aid and abet violations of

Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17

C.F.R. § 240.10b-5(a), (b), and (c)].

## COUNT VII – REPORTING PROVISIONS VIOLATIONS

**Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)]
and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. § 240.12b-
20, 240.13a-1, 240.13a-11, and 240.13a-13] by REVO and UBRG,
and Aided and Abetted by Ali
(Against REVO and Ali)**

167.   Paragraphs 1 through 143 are realleged and incorporated herein by

reference.

168.   Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-

20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. § 240.12b-20, 240.13a-1, 240.13a-11, and

240.13a-13] thereunder, require issuers of registered securities to file with the

Commission timely and factually accurate quarterly, annual, and current reports.

169.   As described above, Defendant REVO violated, and unless enjoined

will continue to violate, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1,

13a-11, and 13a-13 thereunder, by, at a minimum, failing timely to file quarterly,

annual, and current reports, and by filing quarterly, annual, and current reports that

were materially false and misleading, and failed to include, in addition to the

information expressly required to be stated in such reports, such further information

as was necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

170.   As described above, UBRG also violated Section 13(a) and Rules 13a-1, 13a-11, and 13a-13 thereunder, by, at a minimum, failing to file quarterly, annual, and current reports.

171.   Defendant Ali aided and abetted REVO's violations of Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, and unless enjoined will continue to aid and abet violations of Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

172.   Defendant Ali aided and abetted UBRG's violations of Section 13(a) and Rules 13a-1, 13a-11, and 13a-13 thereunder, and unless enjoined will continue to aid and abet violations of Section 13(a) and Rules 13a-1, 13a-11, and 13a-13 thereunder.

### COUNT VIII – CONTROL PERSON LIABILITY (REPORTING PROVISIONS VIOLATIONS)

**Violations of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] (Against Ali)**

173.   Paragraphs 1 through 143 are realleged and incorporated by reference herein.

174.    At all times relevant hereto, Defendant Ali controlled REVO and

UBRG for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

175.    By engaging in the conduct alleged above, Defendant Ali is liable as a

control person for REVO's violations of Section 13(a) of the Exchange Act [15

U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R.

§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

176.    By engaging in the conduct alleged above, Defendant Ali is also liable

as a control person for UBRG's violations of Section 13(a) of the Exchange Act [15

U.S.C. § 78m(a)] and Rules 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §

240.13a-1, 240.13a-11, and 240.13a-13].

### COUNT IX – EQUITY BENEFICIAL OWNERSHIP REPORTING VIOLATIONS (OFFICER, DIRECTOR, OR TEN PERCENT OWNER)

**Violations of Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)]
and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3]
(Against Ali and DeLong)**

177.    Paragraphs 1 through 143 are realleged and incorporated by reference

herein.

178.    Section 16(a) of the Exchange Act and Rule 16a-3 thereunder, require

that any person who is directly or indirectly the beneficial owner of more than 10%

of any class of any equity security (other than an exempted security) which is

registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or who is a

46

director or an officer of the issuer of such security, must notify the Commission within 10 days after such person becomes such a beneficial owner, director, or officer, by filing certain required statements on Form 3.  Additionally, Section 16(a) of the Exchange Act requires that if there has been a change of such ownership, the reporting person must file with the Commission a statement indicating such change, generally due before the end of the second business day following the day on which the transaction has been executed.  Rule 16a-3 of the Exchange Act requires that statements of change in beneficial ownership be filed on Form 4, and certain required annual statements of beneficial ownership be filed on Form 5.

179.    Ali and DeLong failed to file reports with the Commission regarding REVO common stock, as required by Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3].

180.    By engaging in the above conduct, Ali and DeLong violated, and unless restrained and enjoined will continue to violate, Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3].

## COUNT X – EQUITY BENEFICIAL OWNERSHIP
## <u>REPORTING VIOLATIONS (FIVE PERCENT OWNER)</u>

**Violations of Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1]**
**<u>(Against DeLong, Rainco, and Singletary)</u>**

181.    Paragraphs 1 through 143 are realleged and incorporated by reference herein.

182.    Exchange Act Section 13(d)(1) and Rule 13d-1 provide that any person who directly or indirectly becomes or is deemed to become the beneficial owner of more than 5% of a class of equity securities registered under Section 12 of the Exchange Act must file with the Commission a Schedule 13D or Schedule 13G to report such ownership within 10 days of the acquisition.

183.    Defendants DeLong, Rainco, and Singletary, after acquiring directly or indirectly the beneficial ownership of more than 5% of REVO common stock, constituting a class of equity securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], failed to file within 10 days with the Commission a statement containing the information required by Schedule 13D [17 C.F.R. § 240.13d-101].

184.    By reason of the foregoing, Defendants DeLong, Rainco, and Singletary violated Section 13(d) of the Exchange Act and Rule 13d-1 thereunder, and unless restrained and enjoined, will continue to violate these provisions.

## COUNT XI – CONTROL PERSON LIABILITY

### Violations of Section 20(a) of the Exchange Act
### [15 U.S.C. § 78t(a)]
### (Against Singletary)

185.   Paragraphs 1through 143 are realleged and incorporated by reference herein.

186.   At all times relevant hereto, Defendant Singletary controlled Rainco for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

187.   By engaging in the conduct alleged above, Defendant Singletary is liable as a control person for Rainco's violations of Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

## PRAYER FOR RELIEF

The Commission respectfully requests that this Court:

1.   Find that Defendants committed the violations alleged herein;

2.   Permanently enjoin Defendants and each of their agents, employees, and attorneys, and any other person or entity in active concert or participation with them who receives actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in conduct in violation of the following provisions, or aiding and abetting violations of the following provisions, as applicable to each of the Defendants as described above:  Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]; Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. § 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13]; Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3]; and Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

3.     Order Defendant Ali to disgorge all ill-gotten gains in the form of any benefits of any kind derived from the illegal conduct alleged in this Complaint, plus prejudgment interest;

4.     Order Defendants to pay civil penalties pursuant to, as applicable, Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] in an amount to be determined by the Court;

5.     Issue an Order pursuant to, as applicable, Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], and the inherent equitable powers of this Court, permanently prohibiting Defendants Ali, Singletary, and DeLong from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section

12 of the Exchange Act or which is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act;

6.      Issue an Order pursuant to, as applicable, Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)], Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], and the inherent equitable powers of this Court, which bars Defendants Ali, Singletary, and DeLong from participating in any offering of a penny stock, including acting as a promoter, finder, consultant, agent, or other person who engages in activities with a broker, dealer, or issuer for purposes of the issuance or trading in any penny stock; or inducing or attempting to induce the purchase or sale of any penny stock.

7.      Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court; and

8.      Order such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## **JURY TRIAL DEMAND**

The Commission demands a trial by jury on all issues that may be so tried.


Dated: April 27, 2018                     Respectfully submitted,

                                          /s/ Harry B. Roback
                                          M. Graham Loomis (GA Bar No. 457868)
                                          William P. Hicks (GA Bar No. 351649)
                                          Harry B. Roback (GA Bar No. 706790)
                                          Lucy T. Graetz (GA Bar No. 304082)
                                          U.S. Securities and Exchange Commission
                                          950 East Paces Ferry Road, NE, Suite 900
                                          Atlanta, GA 30326
                                          Tel:(404) 942-0690 (Roback)
                                          Facsimile:  (404) 842-7679
                                          RobackH@sec.gov

                                          Attorneys for Plaintiff

## **CERTIFICATION OF COMPLIANCE**

This is to certify that the foregoing was prepared using Times New Roman 14 point font in accordance with Local Rule 5.1 (B).

/s/ Harry B. Roback
Harry B. Roback